## Herbert A Viergutz

| | |
|---|---|
| **From:** | "Thomas Austin Jr" <rudyjr_ak@yahoo.com> |
| **To:** | <barmar@gci.net> |
| **Sent:** | Wednesday, February 08, 2006 8:28 AM |
| **Attach:** | suit statement draft.doc |
| **Subject:** | state v Austin draft statement |

Mr. Viergutz,

Sorry this took so long. I have also attached the follwing as a word document. I hope this does not soud like excuses.

This statement is not a list of excuses but some reasons that I did these unlawful actions

1. I agree that I did manipulate the in an unlawful manner
2. I did not do this to provide false data to the EPA but to avoid conflicts with APSC management.
3. All data would have passed the CFR EPA method 602 QA parameters without manipulation.
4. No measurable concentrations of analytes were found in the associated samples
5. Curves were being constructed by very inexperience technicians and they were not optimizing the analytical software's integration algorithms as part of this process. This led to poor peak integration in samples associated with the curves.
6. To overcome this problem I used the software's own optimizing algorithms to correct what I saw as badly integrated peaks. This does not set a flag on the data as being manipulated data. As many software packages do this without flagging data I honestly did not know that this was manual integration. I saw the relevant EPA document after the fact. No excuse. I suggest that EPA send this document to the major software developers so that that they can incorporate this into new revisions of their programs.
7. When I first saw the problem stated in 5 I emailed the laboratory Quality Assurance (QA) Officer, Roland Grabbe. I asked him to come to Valdez and give all of us a class on curve construction and chromatogram integration expectations. I was told by him that he was involved in reviewing data from other laboratories and wouldn't have the time.
8. The expectations of the Laboratory Manager, Carol Garrison, were that no mistakes were allowed. Any data that fell outside her SOP specifications were the analyst fault. This can be seen in the amount of time that the documents outlining these issues (non-conformance memos) took to be resolved. In all other laboratories I have worked in and good laboratory practices (GLP) states that a person outside the management chain should be responsible for QA decisions. This was not the case in this lab. Carol Garrison was the final signatory on any non-conformance or, for that matter, any QA decision. This meant anytime any problem occurred you were discussing the problem with the person who could change your employment or salary status.
9. This attitude by Carol Garrison led to some erasures of failed QA sample data files and re-analysis of these QA samples for the record. This was done and QA samples were acceptable before associated samples were analyzed. I do no mean to imply any form of "time travel". With no or few recorded failed QA samples the in-house statistical control limits became narrower. After months of this practice some analytes were approaching the cumulative statistical error of the analytical system. This led me to integrate failing analytes with, in my opinion, poor chromatography and then remove the system flag showing that I did this action
10. The other technicians considered me an outsider and someone who had taken a position from a person that was well liked. Also, in several cases, there were issues with my handicap and speech pattern in some cases. These cases were discussed with both Kathy Zinn (direct supervisor) and Roland Grabbe at various times with no resolution or even acknowledgement of the issue. This precluded me from using my own experience to help train people. I was actually told one time by Kathy Zinn that I was and Indian and not a chief anymore and that the eighteen years of experience I had would be tapped only when she wanted it.

2/8/06